**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Loland L. C.,

                Plaintiff,

v.

Andrew Saul,
Commissioner of Social Security,

                Defendant.

Case No. 19-cv-1020 (ECT/DTS)

**REPORT AND**
**RECOMMENDATION**

---

Laura S. Melnick, Southern Minnesota Regional Legal Services, Inc., 55 East Fifth Street, Suite 400, St. Paul MN 5501 (for Plaintiff); and

Marisa Silverman, Assistant Regional Counsel, Social Security Administration, 1301 Young Street, Suite A702, Dallas TX 75202 (for Defendant).

---

**INTRODUCTION**

Plaintiff Loland C. contests Defendant Commissioner of Social Security's denial of his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–34, and supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381. The parties filed cross-motions for summary judgment, which were referred to the undersigned for a report and recommendation to the district court, the Honorable Eric C. Tostrud, United States District Judge for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 7.2 and 72.1. For the reasons set forth below, this Court recommends granting Palintiff's motion, denying Defendant's motion, and remanding with instructions to award benefits to Plaintiff.

1

**FINDINGS OF FACT**

## I.      Procedural History

Plaintiff filed the instant action for DIB and SSI in December 2015, alleging a disability onset date of April 25, 2015. Plaintiff alleges impairments of learning disability, depressive disorder, generalized anxiety disorder, personality disorder, diabetes with peripheral neuropathy, TBI, and hyperlipidemia. Plaintiff was found not disabled and that finding was affirmed upon reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge. A hearing was held and, on July 27, 2018, the ALJ issued a decision denying Plaintiff's claim for benefits. Plaintiff sought review of the ALJ's decision through the Appeals Council, which denied review. Plaintiff then sought review in this Court.

## II.      The ALJ's Decision

The ALJ found Plaintiff had the severe impairments of unspecified personality disorder, depressive disorder NOS, generalized anxiety disorder, mild learning disorder, borderline intellectual functioning, and diabetes with mild neuropathy. (Tr. 13). The ALJ next concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of a listing in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 14). Specifically, the ALJ analyzed Plaintiff's impairment under Listings 12.04 (depressive, bipolar, and related disorders), 12.05 (intellectual disorder), 12.06 (anxiety and obsessive-compulsive disorders), and 12.08 (personality and impulse-control disorders). (Tr. 14–17). In looking at the Paragraph B criteria, the ALJ found moderate limitation in all categories: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or

managing oneself. (Tr. 14–15). The ALJ determined Plaintiff has the residual functioning capacity ("RFC") to perform light work with various physical limitations and the following mental limitations: "The claimant can perform simple, routine and repetitive tasks; can have occasional, brief and superficial contact with coworkers, supervisors and the public with superficial defined as no lower than an 8 in terms of the 5th digit of the DOT Code." (Tr. 17). The ALJ, in a footnote, explained that "[t]he '8' for people function (fifth digit) deals with taking instructions – helping." (Tr. 17) (citing POMS DI 25001.001). The ALJ determined there are jobs in the national economy that Plaintiff could perform. (Tr. 24–25). Accordingly, Plaintiff was found not disabled from April 25, 2015 through the date of the ALJ's decision. (Tr. 25).

## CONCLUSIONS OF LAW

### I. Legal Standard

Disability benefits are available to individuals determined disabled. 42 U.S.C. §§ 423(a)(1), 1381a; *accord* 20 C.F.R. §§ 404.315, 416.901. An individual is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505(a). This standard is met when a severe physical or mental impairment, or combination of impairments, renders the individual unable to do his previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account his age, education, and work experience. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see*

*also* 20 C.F.R. § 404.1505(a). Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. § 404.1512(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).

If "substantial evidence" supports the findings of the Commissioner, then these findings are conclusive. 42 U.S.C. § 405(g). "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011). The Court's review of the Commissioner's final decision, though deferential, is not a rubber stamp. The Court must review the decision to ensure it is supported by substantial evidence in the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003). In performing this review, the Court must consider not only evidence that supports the ALJ's decision but also whatever in the record detracts from it as well. *Minor v. Astrue*, 574 F.3d 625, 627 (8th Cir. 2009); *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000). A court cannot reweigh the evidence or "reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion or merely because [a court] would have decided the case differently." *Harwood v. Apfel*, 186 F.3d 1039, 1042 (8th Cir. 1999).

4

## II.    Listing 12.08 (personality and impulse-control disorders)

Listing 12.08 covers disorders "characterized by enduring, inflexible, maladaptive, and pervasive patterns of behavior," such as "paranoid, schizoid, schizotypal, borderline, avoidant, dependent, obsessive-compulsive personality disorders, and intermittent explosive disorder." 20 C.F.R. pt. 404, subpt. P, app. 1, 12.00(B)(7). Listing 12.08 requires satisfaction of "Paragraph A" and "Paragraph B" criteria. 20 C.F.R. pt. 404, subpt. P, app. 1, 12.00(A)(2). Paragraph A lists medical criteria that must be present in a claimant's medical evidence. 20 C.F.R. pt. 404, subpt. P, app. 1, 12.00(A)(2)(a). This includes:

> patterns of distrust, suspiciousness, and odd beliefs; social detachment, discomfort, or avoidance; hypersensitivity to negative evaluation; an excessive need to be taken care of; difficulty making independent decisions; a preoccupation with orderliness, perfectionism, and control; and inappropriate, intense, impulsive anger and behavioral expression grossly out of proportion to any external provocation or psychosocial stressors.

20 C.F.R. pt. 404, subpt. P, app. 1, 12.00(B)(7)(a).[1]

Paragraph B evaluates the following areas of mental functioning that a person uses in a work setting: (i) understand, remember, or apply information; (ii) interact with others; (iii) concentrate, persist, or maintain pace; and (iv) adapt or manage oneself. 20 C.F.R. pt. 404, subpt. P, app. 1, 12.00(A)(2)(b). The Agency determines the degree to which the claimant's mental impairment affects his ability to function independently, appropriately, effectively, and on a sustained basis as to each of these four categories. *Id.* To satisfy Paragraph B criteria, a claimant must have either "extreme" limitation in one or "marked" limitation in two of the four areas. *Id.* A "moderate" limitation means a claimant's

---

[1] The parties do not dispute that Paragraph A criteria are present here. Like the ALJ, the parties immediately discuss Paragraph B criteria.

functioning is "fair," while "marked" means that functioning is "seriously limited." 20 C.F.R. pt. 404, subpt. P, app. 1, 12.00(F)(2)(c), (d).

The ALJ found moderate limitation in all four Paragraph B categories when evaluating Plaintiff's mental impairments. Plaintiff argues that he meets Listing 12.08 insofar as he should have been found "marked" in all four categories and that the ALJ erred in findings otherwise. Defendant argues the ALJ made no such error.

## A.    Interacting with Others

Examples demonstrating this information include: "cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues; responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness." 20 C.F.R. pt. 404, subpt. P, app. 1, 12.00(E)(2).

In interacting with others, the ALJ indicated there "were times when [Plaintiff] was referred to as irritable, anxious and confrontational" but "also times when [he] was calm and cooperative." (Tr. 14). "At one time, it was documented [Plaintiff] made the choice not to engage in confrontation with someone" and the "medical expert testified that [Plaintiff] was able to control his emotions." (Tr. 14). The ALJ indicated Plaintiff "participated in community service, which is presumably around other people." (Tr. 14). The ALJ recounted that Plaintiff testified "he was asked not to return to some past jobs due to his inability to get along with his coworkers." (Tr. 14). Finally, the ALJ noted Plaintiff "did not report avoiding being around others, for instance, at the grocery store. He is able to walk on the skyway near his apartment." (Tr. 14).

The ALJ then reiterated his Paragraph B findings when discussing the medical opinions of LuAnn Kay Hanson, MSW, LICSW, as follows:

> Again, as noted above, the record certainly does show [Plaintiff] has trouble interacting with others, but there are also times the record noted [Plaintiff] was at least able to interact without having to be restrained or banned from a treatment facility. He had some legal troubles, but was required to engage in community service, which assumingly involved some contact with others. He has not had any type of restraining order against him. In addition, he is able to live by himself, take public transportation and show up for treatment, particularly his court-ordered treatment. The undersigned finds that taking into account all the evidence, not just the evidence showing poor functional findings, moderate limitations are more appropriate. This is also consistent with the medical expert's opinion provided at the hearing.

(Tr. 22).

The ALJ's finding is not supported by substantial evidence in the record as a whole. Most glaringly, the ALJ squarely relied upon factually incorrect statements. The ALJ asserted Plaintiff had no restraining order, thus concluding that he did not have marked limitation in interacting with others. But Plaintiff was under a restraining order from February 2014 through March 2017 related to a felony third-degree assault conviction. (Tr. 316–19). And while Plaintiff was not banned from a treatment facility, he was kicked out of a dentist's office in July 2016 and did not understand why, and was kicked out of more than one commercial establishment or public area (Tr. 777, 905, 967). These factual errors made by the ALJ were central to his decision finding that Plaintiff had only moderate limitation in interacting with others.

But these specific factual errors are not all that ails the ALJ's decision with respect to finding that Plaintiff had only moderate limitation in interacting with others. The ALJ noted the medical expert testified that Plaintiff was able to control his emotions "at one time." (Tr. 14). But a *single* instance of Plaintiff controlling his emotions when interacting

with others does not transform into a "fair" ability to "function independently, appropriately, effectively, and on a sustained basis." Rather, the single instance points to the opposite conclusion, that Plaintiff cannot *sustain* that ability to control his emotions while interacting with others. Further undercutting the ALJ's conclusion, the medical expert testified that Plaintiff was "sometimes marked" when interacting with others. (Tr. 15). By definition, if claimant's impairment in interacting with others is variable and is "sometimes marked," he is not functioning at a fair level on a consistent basis, as required by the regulations to sustain a finding of only "moderate" impairment. The ALJ gave the medical expert's testimony "great weight," (Tr. 15), but then disregarded those portions of the opinion testimony that contradicted his finding. The ALJ cannot "pick and cho[o]se only evidence in the record buttressing his conclusion." *Taylor v. Barnhart*, 333 F. Supp. 2d 846, 856 (E.D. Mo. 2004). The ALJ failed to explain why his conclusion differed from the medical expert's testimony that he afforded "great weight." The ALJ's failure to explain this discrepancy constitutes error. *Marnell v. Barnhart*, 253 F. Supp. 2d 1052, 1082 (N.D. Iowa 2003).

Taking away the ALJ's reliance upon factual errors and his unexplained rejection of a single portion of the medical expert's testimony that he otherwise afforded great weight, the medical record—considered as a whole—only supports a finding that Plaintiff has marked limitation in interacting with others.

Plaintiff is persistently unable to handle conflict with others or cooperate with others. Foremost, he was subject to a no contact restraining order as a result of a felony third-degree assault conviction. (Tr. 316–19). In a diagnostic assessment on March 10, 2014, Plaintiff was considered to be "provoked easily by others." (Tr. 561). Plaintiff was

"abusive to staff when he calls" his therapist. (Tr. 569–70). In June 2016, Plaintiff believed he would be kicked out of a coffee shop the next time he was going because "they tried to cheat me out of 51 cents."(Tr. 777). He "made quite a big stink out [of] the issue[] and would not take no for an answer." (Tr. 777). On August 19, 2016, Physician Assistant Darrel Cotch opined that, due to Plaintiff's "impulse control and irritability," it would be hard for him to get along with coworkers were he to work. (Tr. 901). On January 24, 2017, Ms. Hanson wrote that Plaintiff "misreads situations and does tend to get in people's face about things." (Tr. 794). At an appointment with Mr. Cotch on February 7, 2017, Mr. Cotch wrote that he was "not sure that [Plaintiff's] quick flare to irritability is going to be helped so much with medication," but rather believed it to be due to Plaintiff's "personality and borderline intellectual functioning." (Tr. 894). Mr. Cotch found Plaintiff to be "prone to quick irritation and gets into altercations with others." (Tr. 894). Later that month, on February 28, Plaintiff told Ms. Hanson he did "not know why people always raise their voiced with me;" Ms. Hanson found Plaintiff had "no insight into how he comes across to others." (Tr. 999).

Plaintiff cannot sustain conversation or understand others' attempts to converse, whether through requests, suggestions, or challenges of their own. Rather, Plaintiff often responded with irritability, argumentativeness, and suspiciousness. On May 12, 2014, Plaintiff had slightly pressured speech, "with intermittent derailments, excessive details and perseveration." (Tr. 498). Plaintiff tied his job stability with his recurring beliefs that he is being racially discriminated against. (Tr. 498). At an urgent care encounter, Plaintiff's speech was pressured, his thought content was loose with flight of ideas, including a "component of paranoia." (Tr. 522). At a diagnostic assessment with Ms. Hanson on

August 5, 2015, Plaintiff had a "tendency towards perseveration" and repeating his frustrations and confusions, he was "very disjointed[] and difficult to follow." (Tr. 539). Plaintiff was increasingly frustrated and anxious, with demonstrations of paranoia. (Tr. 539). On December 11, 2015, Ms. Hanson noted Plaintiff's form of thought was tangential and rambling; he "cannot let another person get a word in, and he tends to get louder and louder." (Tr. 556). Ms. Hanson wrote that Plaintiff "misunderstands much of what happens to him." (Tr. 556). At a February 9, 2016 therapy appointment with Ms. Hanson, Plaintiff reported he "felt the pharmacy was making fun of him" so he "wants to talk to administration about it." (Tr. 619). Ms. Hanson indicated Plaintiff "struggles with not knowing what to do with his feelings." (Tr. 619). Later that month, on February 23, Ms. Hanson wrote: Plaintiff "continued to believe a lot of people have it in for him. He finds relationships with people very difficult, and imagines the worst about most. He has experienced some racial discrimination, without a doubt, but the paranoia is greater than that."(Tr. 622). Ms. Hanson wrote that Plaintiff perseverates on what someone says, and turns it into a negative." (Tr. 622). On September 2, 2016, Plaintiff was "frustrated" at being mistreated by his therapy clinic "due to this place being racist." (Tr. 784). Ms. Hanson wrote that Plaintiff was "not willing to look at himself, and did not ever feel he did anything wrong." (Tr. 784). On March 24, 2017, an orthopedist found it "quite challenging" to get an accurate history of Plaintiff's left shoulder pain because Plaintiff "want[ed] to control the conversation." (Tr. 932). Moreover, as discussed in the section below, Plaintiff had many odd interactions with healthcare workers that further demonstrate his deficits in interacting with others.

In sum, the ALJ's conclusion that Plaintiff is only moderately impaired is not supported by substantial evidence in the record as a whole. Rather, the medical record as a whole establishes that Plaintiff has marked limitation in interacting with others.

### B.     Adapting or Managing Oneself

Examples demonstrating this information include: "Responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions." 20 C.F.R. pt. 404, subpt. P, app. 1, 12.00(E)(4).

In the last category, adapting or managing oneself, the ALJ indicated how Plaintiff was "disheveled during some of his therapy appointments." (Tr. 15). Plaintiff "live[s] on his own, which he has done for a number of years, and he testified he is able to use public transportation." (Tr. 15). Plaintiff "did not report he needed assistance performing his daily routine." (Tr. 15). The ALJ next noted "[t]here are no notes that [Plaintiff] had significant levels of depression that he has trouble getting out of bed." (Tr. 15). Plaintiff's "most recent IQ score is in the borderline range." (Tr. 15). And lastly, the ALJ stated: "The medical expert cited to [Plaintiff's] involvement in court ordered therapy and compliance with minimum requirements to avoid consequences . . . ." (Tr. 15). The ALJ's conclusion that Plaintiff only has moderate limitation in managing himself is not supported by substantial evidence in the record. Rather, the medical record commands a finding that Plaintiff has marked limitation in this Paragraph B category.

The ALJ only noted that Plaintiff was "disheveled during some of his therapy appointments," (Tr. 15), which vastly understates Plaintiff's inability to maintain personal hygiene appropriate for a work setting. While Plaintiff was dressed appropriately on May 12, 2014, he had a "noticeable body odor" at a therapy appointment. (Tr. 498). At an urgent care visit on April 27, 2015, Plaintiff was disheveled and malodorous. (Tr. 522). At a diagnostic assessment on August 5, 2015, Plaintiff was again noted to be disheveled with poor hygiene. (Tr. 541). At another diagnostic assessment on June 6, 2016, Plaintiff was once again disheveled. (Tr. 651). And two days later, on June 8, Plaintiff's poor hygiene was noted at a psychiatry appointment. (Tr. 746). And Plaintiff was disheveled on February 15, 2017. (Tr. 659).

These were not isolated incidents, however. Ms. Hanson saw Plaintiff regularly for therapy appointments. Plaintiff had poor hygiene at a mental health appointment on November 6, 2015. (Tr. 554, 607). Ms. Hanson continued to note Plaintiff's poor hygiene at the next ten successive mental health appointments spanning nearly one year: December 11, 2015, January 15, 2016, January 26, 2016, February 9, 2016, February 23, 2016, April 1, 2016, April 22, 2016, May 13, 2016, June 28, 2016, September 2, 2016. (Tr. 556, 610, 613, 616, 619, 622, 627, 767, 773, 777, 784). Plaintiff's ability to manage himself then deteriorated, with him having not only poor hygiene but also having dirty clothes at his therapy appointments on October 7, 2016, October 28, 2016, and December 12, 2016. (Tr. 788, 790, 792). Plaintiff's ability further worsened, with "very dirty clothes and very poor hygiene" at mental therapy with Ms. Hanson on January 24, 2017, February 21, 2017, February 28, 2017, April 25, 2017, and May 16, 2017. (Tr. 794, 1007, 1003, 999, 995, 991). Plaintiff's "very poor hygiene" continued on August 11, 2017,

12

September 22, 2017, December 4, 2017, and February 9, 2018. (Tr. 977, 967, 964, 961). Ms. Hanson, in a medical opinion dated October 12, 2017, again noted Plaintiff has poor hygiene as an overall observation from her therapy sessions. (Tr. 798). So, from December 2015 through February 2018, Ms. Hanson found Plaintiff had deficits in hygiene, attire, or both.

True, as Defendant points out, there were times when Plaintiff did not exhibit difficulties maintaining personal hygiene and appropriate attire. At a diagnostic assessment on March 10, 2014, Plaintiff was "appropriately dressed and groomed." (Tr. 561).  At an August 25, 2014 therapy appointment Plaintiff's "grooming and hygiene were good." (Tr. 480). At a therapy appointment with Ms. Hanson on August 26, 2015, Plaintiff was "casually groomed." (Tr. 543). And at a July 8, 2016 psychiatric evaluation, Plaintiff had "[f]air grooming and hygiene." (Tr. 908). A progress note from Plaintiff's case worker with Ramsey County Human Services noted she met with Plaintiff on December 15, 2016, indicating she believed Plaintiff's "hygiene and grooming can be described as fair." (Tr. 656).

In June 2016, Plaintiff had many appointments via Ramsey County Human Services, often several appointments in one day comprised of individual psychiatry and group psychotherapy. While under this intensive regimen, Plaintiff maintained some form of "adequate" to "fair" to "good" to "appropriate" grooming and/or hygiene. On June 10, 2016, Plaintiff was considered adequately groomed. (Tr. 734). On June 15, 2016, Plaintiff's grooming was appropriate. (Tr. 715). On June 17, 2016, Plaintiff's grooming was appropriate at his psychiatry appointment. (Tr. 701). At group psychotherapy, his grooming and appearance were good. (Tr. 705). On June 21, 2016, Plaintiff's grooming

and appearance were good. (Tr. 693). On June 22, 2016, Plaintiff had a group psychotherapy and his grooming and appearance were good as rated by one provider and he was "adequately groomed" as rated by another. (Tr. 683, 691). And at a psychiatry meeting that same day his grooming was appropriate. (Tr. 688). Plaintiff was noted to be "adequately groomed" at a group psychotherapy on June 23, 2016. (Tr. 679). Plaintiff had a group psychotherapy meeting on June 24, 2016 and was noted to be "adequately groomed" and have good grooming and appearance by two separate providers. (Tr. 657, 669). That same day, a psychiatry provider likewise noted Plaintiff's grooming was appropriate. (Tr. 667).

This period of intensive treatment and therapy in June 2016 where Plaintiff was under near constant monitoring, mixed with a few additional isolated incidents of appropriate hygiene and attire, is insufficient to find Plaintiff can manage his own personal hygiene and attire at a moderate level. Rather, the medical record shows Plaintiff had difficulties maintaining appropriate hygiene and attire before the intensive treatment in June 2016 and afterwards when he was removed from this highly-regimented structure. Simply put, scattered occurrences of appropriate hygiene and attire cannot render meaningless the longitudinal reality of the medical record that Plaintiff has marked difficulties in maintaining socially-acceptable levels of personal hygiene and attire such as would befit a person able to work in the economy.

In looking at the other matters encompassed within the category of managing oneself, the ALJ noted various activities of daily living, such as Plaintiff living alone, using public transportation, that his depression does not lead to "trouble getting out of bed," his recent IQ score was only in the "borderline range," and Plaintiff meeting the "minimum

14

requirements" of court-ordered therapy. (Tr. 15). But the ALJ erred to consider those matters actually necessary for a finding as to Plaintiff's ability to manage himself: responding to demands, adapting to changes, managing his psychologically-based symptoms, distinguishing between acceptable and unacceptable work performance, setting realistic goals, making plans for himself independently from others, and being aware of normal hazards and taking precautions. When considering these matters, the medical record supports a finding that Plaintiff has marked limitation in this Paragraph B category. Thus, the ALJ's decision that Plaintiff in only moderately limited is in error.

The record is replete with instances with Plaintiff's inability to manage his psychological symptoms and ailments, rendering him unable to respond to demands, adapt to changes, set realistic goals, or distinguish between acceptable and unacceptable behaviors. On September 16, 2014, Plaintiff was unwilling to discuss management of his diabetes until his medical provider would "tell him the name of the disease causing the electric shocks that was caused from his laptop." (Tr. 515). When the provider attempted to explain and reassure Plaintiff that his laptop was not shocking him, he was unhappy with the explanation. (Tr. 515). Plaintiff's odd medical requests continued. On April 27, 2015, Plaintiff was seen on complaint of headache and back pain, but asserted that a man on the bus "punctured him" and Chipotle "poisoned him." (Tr. 522). Plaintiff refused to be treated by anyone not wearing gloves. (Tr. 522). Plaintiff then was offered ibuprofen for his headaches but did not understand how it worked then refused any unless he could personally observe it being dispensed. (Tr. 522–23). On July 15, 2015, Plaintiff questioned the qualifications of the treating podiatrist, refused to answer her questions, called her a racist, and demanded information to file a complaint. (Tr. 536). The next

15

month, in August 2015, at the behavioral health assessment triggered by his April 2015 appointment, Plaintiff demonstrated perseveration, was very disjointed and difficult to follow, and he got increasingly frustrated and anxious as the session went on. (Tr. 539). Plaintiff also complained of touching a computer mouse a couple months prior which started pain in his feet. (Tr. 539). He then asserted his doctors do not check his feet, only their computer notes, so he was looking for a way to "take some of those notes out." (Tr. 539). On May 16, 2016, Plaintiff went to the emergency room for left-sided chest pain but was "uncomfortable with his current RN," stating he was "too tall" and requested a new nurse. (Tr. 838). Plaintiff then left the emergency room without letting staff know and without any laboratory results. (Tr. 838–39). On August 31, 2016, Plaintiff arrived 20 minutes early to his appointment after slipping and hurting his head one or two weeks prior, causing headaches, but was "upset he had to wait to be seen," and then when he did not get the requested x-ray "to make sure everything was good," but was instead provided a refill on Tylenol, he "abruptly left the room." (Tr. 782).

Plaintiff's repeated inability to manage his psychological symptoms when interacting with healthcare workers, persons dedicated to treating his ailments, shows marked limitation in ability to manage himself. Plaintiff regularly made unrealistic demands, was unable to comprehend basic medical advice, assigned incredible motives to the professionals helping him, and provided ascribed farfetched causes to the ailments facing him. These are not actions or beliefs of a person that has merely moderate limitation in managing himself. The ALJ's conclusion that Plaintiff is only moderately impaired is not supported by substantial evidence in the record as a whole; instead, the

16

medical record as a whole supports a finding that Plaintiff has marked limitation in managing himself.

In short, Plaintiff's medical records describe symptoms of his severe personality disorder that significantly impair both his interactions with others and his ability to manage his own emotions and behavior. These records describe **abusiveness** (T. 570, 590); **agitation** (T. 497, 554, 556, 607, 613, 762, 902, 961, 964, 967); **anger** (T. 536, 538, 540, 565, 574, 587, 613, 632, 681, 741, 746, 767, 797, 857, 894, 901, 961, 964, 967); **refusal to answer questions** (T. 480, 497, 519, 530, 536, 539); **"bizarre" behavior** (T. 838); **dishevelment** (T. 522, 541, 651, 659); **body odor or poor/very poor hygiene** (T. 498, 522, 541, 554, 556, 607, 610, 613, 616, 619, 622, 627, 746, 767, 773, 777, 784, 788, 790, 792, 794, 798, 961, 964, 967, 977, 991, 995, 999, 1003, 1007); **defensiveness** (T. 571, 574, 582, 587, 999); **delusions** (T. 522, 539); **demanding, accusatory, confrontational, blaming, or argumentative** behavior (T. 515, 632, 678, 746,, 762, 777, 782, 784, 788, 790, 792, 794, 797, 839, 902, 925, 932, 956, 967, 991, 995, 1007); **disjointedness** (T. 539); **distressed or "stressed"** demeanor (T. 522, 541, 554, 556, 607, 610, 616, 619, 627, 632, 767, 773, 798, 901, 906, 960, 961, 963, 967); **history of threats or violence** (T. 500, 649, 641, 659); **hostility** (T. 539, 541, 797, 800); **irrationality or illogical thoughts or behaviors** (T. 530, 539, 798, 961, 964, 967); **isolative behavior** (T. 539, 622, 797); **excessively loud speech** (T. 56, 610, 651, 659, 694, 705, 777, 784, 788, 790, 792, 794, 908, 961, 964, 967, 991, 995, 999, 1003, 1007); **paranoia or suspiciousness** (T. 480, 522, 539, 542, 554, 607, 616, 619, 622, 679, 688, 696, 767, 784, 788, 790, 792, 797, 800, 894, 897, 898, 901, 956, 961, 964, 967, 991, 999, 1003); **obsessiveness or perseveration** (T. 498, 539, 622, 689, 699, 705, 716, 728,

17

734, 746, 750, 794, 797, 800, 1007); **pressured or rapid speech** (T. 480, 498, 522, 530, 651, 659, 797, 918, 949, 960, 961, 964, 967, 991); **resistance** (T. 522); **thought broadcasting** (T. 522); and "**intense" or unusual" affect** (T. 519, 632, 777, 784, 788, 790, 792, 991, 995). In contrast, the isolated references to Plaintiff's productive instances of interacting with others and in managing himself are just that, isolated and infrequent.

### C.    Understanding, Remembering, or Applying Information and Concentrating, Persisting, or Maintaining Pace

Again, the ALJ found moderate limitation in all Paragraph B categories. The Court would likely find additional error in the findings as to both understanding, remembering, or applying information and concentrating, persisting, or maintaining pace. The record is littered with references from Plaintiff's care providers discussing the difficulties in following Plaintiff's conversation, Plaintiff's perseveration and inability to switch to other topics, his lack of ability to understand his medical care providers, and his unwillingness to allow others to participate in his monological speech. But because the Court already found that the ALJ erred in finding moderate limitation in interacting with others and adapting or managing oneself, where those categories should be considered marked, Plaintiff meets a listing and benefits must be awarded. Thus, there is no need to delve fully into these other Paragraph B categories.

### D.    Conclusion

The ALJ erred in failing to find Plaintiff did not meet Listing 12.08. The ALJ's decision that Plaintiff has only moderate limitation in all Paragraph B criteria is not supported by substantial evidence in the record as a whole. Rather, the medical record supports a finding that Plaintiff has marked limitation in at least two Paragraph B criteria. As such, a remand with instruction to award benefits is warranted. Because the Court

finds error at Step 3 in the sequential evaluation process, it need not reach Plaintiff's argument that the ALJ improperly weighed the opinion evidence when generating Plaintiff's RFC.

## RECOMMENDATION

Based upon the record, memoranda, and proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED:**

1.   Plaintiff's Motion for Summary Judgment, (ECF No. 12), be **GRANTED.**

2.   Defendant's Motion for Summary Judgment, (ECF No. 14), be **DENIED**.

3.   The decision of the Commissioner of Social Security be **REVERSED** and this matter be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) with instructions to award Plaintiff benefits.

Dated: April 29, 2020                    s/David T. Schultz
                                         DAVID T. SCHULTZ
                                         U.S. Magistrate Judge


## NOTICE

**Filings Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).